IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 1, 2024 Session

## TERRANCE HOLLIDAY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
No. 10-02254    Carlyn L. Addison, Judge

_____

**No. W2023-01179-CCA-R3-PC**

_____

The Petitioner, Terrance Holliday, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing that the post-conviction court erred by denying his motion for recusal and by finding that he received effective assistance of counsel. Based on our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JILL BARTEE AYERS, JJ., joined.

Terrell L. Tooten, Memphis, Tennessee, for the appellant, Terrance Holliday.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Steve Mulroy, District Attorney General; and Monica Timmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

In 2011, the Petitioner was convicted by a Shelby County Criminal Court jury of the first degree premeditated murder of Michael Woods and sentenced by the trial court to life imprisonment with the possibility of parole. His conviction was affirmed by this court on direct appeal, and our supreme court denied his application for permission to appeal. *State v. Holliday*, No. W2011-01734-CCA-R3-CD, 2013 WL 557016, at *1 (Tenn. Crim.

App. Feb. 8, 2013), *perm. app. denied* (Tenn. June 11, 2013). Our direct appeal opinion provides the following summary of the case:

> On February 18, 2009, the victim, Mr. Michael Woods, was shot and killed while having dinner in a Chinese restaurant. Shortly before the shooting, an individual entered the restaurant and tried to get the victim to come outside to speak with someone. The victim refused. Shortly afterward the killer, wearing a black hooded sweatshirt, fired multiple shots into the victim with a semi-automatic pistol. The first shot came from outside the restaurant, through the restaurant's front door. The remaining shots were taken after the killer entered the restaurant, hitting the victim multiple times in the head and chest. The killer fled the scene.

> On April 6, 2010, a Shelby County grand jury indicted the [Petitioner] for the first degree murder of the victim. The grand jury also indicted an accomplice, Mr. Randy Farmer, for facilitating the felony.

*Id*. at *1.

Two of the victim's friends were eyewitnesses to the shooting: Terrance Jackson and Marcus Mull. *Id*. at *1-3. Each identified the Petitioner as the shooter from photographic lineups they were shown by the police, with Mr. Jackson identifying the Petitioner in two separate photographic lineups. *Id*. Trial counsel's efforts to have the pretrial identifications suppressed were unsuccessful, and both men testified at trial consistently with their preliminary hearing testimony, with each making a positive courtroom identification of the Petitioner as the shooter. *Id*.

Mr. Jackson testified that he was with the victim inside the restaurant when a man asked the victim to step outside because someone wanted to see him. *Id*. at *1. The victim refused, and Mr. Jackson offered to go outside to find out who wanted to see the victim. *Id*. Once outside, Mr. Jackson saw the man who had relayed the message talking to the Petitioner, whom Mr. Jackson had never seen before. *Id*. Mr. Jackson stated that he invited the Petitioner and his companion to come inside the restaurant to see the victim, but they refused. *Id*. He said that he had turned to walk away when he heard a gunshot, which caused him to run. *Id*. at *2. When he realized he was not the target, he stopped, turned, and saw the Petitioner repeatedly shooting the victim in the head. *Id*.

Mr. Jackson testified that he and the Petitioner were face-to-face for some time, that there were street lights providing adequate illumination, and that he was able to get a good look at the Petitioner's face. *Id*. at *1. He denied that the homicide detectives suggested

which photograph to choose from the photographic lineups and said that they asked him if he was certain in his identification because he told them that he had been drinking on the day of the victim's murder. *Id*. at *2. He acknowledged on cross-examination that he did not tell the homicide detectives of any distinguishing tattoos or piercings of the Petitioner. *Id*. He also acknowledged that the Petitioner was wearing a hoodie, but he denied that it was pulled down far enough to cover the Petitioner's hairline. *Id*.

Mr. Marcus Mull testified that prior to the shooting, he saw the Petitioner standing outside a tobacco store about thirty feet from the Chinese restaurant. *Id*. He described seeing the individual who came into the restaurant to request the victim's presence outside and then seeing the Petitioner walk from the tobacco store to the Chinese restaurant to fire a gunshot through the door into the restaurant. *Id*. at *2-3. He said that after the initial gunshot, the Petitioner opened the door of the Chinese restaurant and shot the victim twice in the chest and twice in the head, killing him. *Id*. at *3. He stated that he was familiar with the Petitioner from having seen him around the neighborhood during the prior year. *Id*. at *2. He denied that the police suggested which photograph to choose from the photographic lineup or influenced his decision in any way. *Id*. at *3.

On cross-examination, he acknowledged that when he first described the shooter to police, he did not mention any tattoos or scars, "and he had stated that the shooter was wearing a skullcap rather than a hoodie." *Id*. He also acknowledged having initially told the police that he was unsure if he could identify the shooter because he had not gotten a good look at him. *Id*. He denied that he had been drinking or smoking marijuana on the day of the shooting. *Id*.

The State called two additional eyewitnesses to the shooting, Sylvia Wiley and Reginald Mull, who each provided accounts similar to those of Mr. Jackson and Mr. Marcus Mull, but who were unable to identify the shooter. *Id*.

Another State's witness, whose testimony was unsuccessfully challenged by trial counsel in a pretrial motion to suppress, was Curtis Green, "a friend of the [Petitioner]'s recently-deceased co-defendant, Mr. Randy Farmer." *Id*. at *4. Mr. Green testified that on the day of the shooting, he was in a vehicle with Mr. Farmer when Mr. Farmer saw and recognized the victim and asked Mr. Green to drop him off around the corner. *Id*. Approximately fifteen minutes later, Mr. Farmer called to request that Mr. Green come quickly to pick him up, telling Mr. Green that he had participated in a crime. *Id*. Mr. Green said he attempted to pick Mr. Farmer up but could not locate him. *Id*. He stated that Mr. Farmer called him later in the day to tell him where he was located, and when he arrived at that location, Mr. Farmer repeated that he had participated in a crime and gave Mr. Green a cell phone to give to the Petitioner. *Id*.

Mr. Green testified that when he called the Petitioner, the Petitioner indicated that he did not "feel good about the situation" and feared how "things were going to turn out for him." *Id*. The Petitioner also said that "'he just couldn't let anybody slide like that, because if he left (sic) them slide, then everybody else think that they can just come and take something if they want it.'" *Id*. Later, when Mr. Green was giving the Petitioner the cell phone, the Petitioner indicated that he was aware that there were eyewitnesses to his shooting of the victim and said that he would have "acted anyway because he was not going to let the victim 'do that and get away with it.'" *Id*. Mr. Green testified that he "was aware from other sources that the [Petitioner] was referring to having been robbed by the victim." *Id*.

On June 10, 2014, the Petitioner filed a pro se petition for post-conviction relief in which he raised a number of claims, including ineffective assistance of counsel. Following the appointment of post-conviction counsel, he filed an amended petition on February 10, 2016, followed by a second amended petition on July 14, 2017, after his first post-conviction counsel withdrew and a successor post-conviction counsel was appointed. The Petitioner alleged in his pro se and amended petitions that trial counsel was ineffective for, among other things, failing to conduct a proper investigation in order to effectively cross-examine the eyewitnesses' identifications, failing to raise issues relating to violations of the Petitioner's civil rights by the Memphis Police Department, failing to call Lauren Collins as an alibi witness, failing to obtain video of the restaurant where the murder occurred, and failing to file a motion to dismiss "based on the fact that the video was not provided to him[.]"

With respect to the missing video, the Petitioner alleged that although reference was made to a video of the crime scene in the discovery materials provided by the State, trial counsel not only "failed to secure a copy" of what was "potentially exculpatory surveillance video from the scene of the crime[,]" but also "did not file a motion to dismiss based on the fact that the video was not provided to him, if the State alleged that the video was either lost or destroyed." At the evidentiary hearing, the Petitioner primarily argued that trial counsel should have filed a *Ferguson* motion for dismissal or other relief based on the State's loss or destruction of a video that the police obtained from the tobacco store, and it is this latter allegation of ineffective assistance on which he concentrates his argument on appeal.

On June 13, 2023, the Petitioner filed a "Motion to Recuse and/or Disqualify[,]" in which he alleged that the post-conviction court had "made multiple rulings and comments in the past toward [post-conviction counsel] that a reasonable person can interpret as the [post-conviction] court having a bias towards [sic] [post-conviction counsel], or at the minimum, gives the appearance of having a bias against [post-conviction counsel]." In

support, he cited the post-conviction court's unfavorable rulings and disapproving comments about post-conviction counsel's dilatory tactics in other cases before the post-conviction court. He alleged that in one instance, post-conviction counsel was informed by an associate in his office, as well as by several deputies, that the post-conviction court had threatened to hold post-conviction counsel in contempt for failing to appear on a report date that post-conviction counsel's associate had been assigned to cover. He also alleged that the post-conviction court had routinely spoken to post-conviction counsel "in tones in which [post-conviction counsel] interpret[ed] as intentionally and knowingly confrontational and hostile, which ma[de] the defendants that [post-conviction counsel] represent uncomfortable."

The post-conviction evidentiary hearing was held on June 22, 2023. Prior to the start of the hearing, the post-conviction court briefly addressed the Petitioner's motion for recusal. The post-conviction noted that the motion did not appear to comply with Rule 10(b) of the Rules of the Supreme Court because it was not verified and stated that it was dismissing it as untimely and unverified. Post-conviction counsel pointed out that he had filed the motion on June 13, and that it included his declaration that the information in the motion was true to the best of his knowledge and belief. The post-conviction court stated that it would accept post-conviction counsel's declaration but noted that many of the allegations in the petition were related to matters of which post-conviction counsel had no personal knowledge. The post-conviction court then stated that it was dismissing the motion on the basis that it was untimely and unfounded. The post-conviction court denied post-conviction counsel's request for a continuance of the post-conviction evidentiary hearing, noting that the second amended petition had been filed in 2017, and the case set for a hearing sixteen times by the previous post-conviction court. Post-conviction counsel requested that the post-conviction court enter a written order reflecting its denial of the motion to recuse, and the post-conviction court assured post-conviction counsel that it would.

The record in this case includes a June 22, 2023 handwritten order that states the following:

> Petitioner's counsel's Motion is untimely, without merit, frivolous and devoid of any factual basis. Granting the Motion at this late stage in the Proceedings would cause an unjustifiable + needless increase in judicial resources docketing system + increase costs of litigation.

Also included in the record before this court is the post-conviction court's more extensive written order denying the motion to recuse, which is file-stamped as entered on June 20, 2023. Among other things, the post-conviction court addressed the allegations of

- 5 -

unfair adverse rulings toward post-conviction counsel's other clients, "categorically denie[d] the assertions made by [post-conviction] counsel[,]" found that there was "nothing . . . that demonstrate[d] anything remotely indicative of a personal bias that the [post-conviction] court harbor[ed] toward [post-conviction] counsel[,]" found that post-conviction counsel was "simply attempting to unnecessarily delay the adjudication of the matters pending before [the] court and shop for a more convenient forum[,]" and concluded that the "[r]ecusal motion [was] wholly frivolous, and unsupported by any factual proof."

At the evidentiary hearing held on the afternoon of June 22, 2023, trial counsel testified that he had been an attorney for twenty years as of the date of the hearing and for seven years at the time of his representation of the Petitioner. He said his defense in the case was one of misidentification. To that end, he relied on inconsistencies in the photographic lineups, attacked the credibility of the eyewitnesses, and retained an expert witness, Jeffery Neuschatz, whose role was to educate the jury "how identification testimony can be unreliable."

Trial counsel agreed that he filed a motion for discovery. When asked if he ever received "the video" in the case, he responded that, according to his review of his notes, there were potentially two different videos. His notes reflected that on October 29, 2010, he wrote a letter to the prosecutor requesting a video from the neighboring tobacco store that the victim had apparently entered prior to being killed. His notes further reflected that he went to the scene and asked neighboring businesses if they had any video of the outside of the strip mall where the Chinese restaurant was located. Trial counsel testified that none of the neighboring businesses had surveillance video, and that he never received any videos from the State.

Trial counsel testified that he did not raise the State's failure to produce any videos as an issue on appeal because he was satisfied that there were no outside surveillance videos from the businesses he checked, and he did not know what the interior tobacco shop video would have shown or proved, as "the possibilities what it could show would be endless[.]" On cross-examination, trial counsel testified that he felt no need to file a *Ferguson* motion regarding the missing video, repeating that the possibilities of what the video might have shown were endless, and moreover, that the video might not have helped the Petitioner's case:

> And in thinking about it right now on the stand, again, I don't know what the video would've shown. There would've been a multitude of things it could've shown. It could've, you know, it could've benefited [the Petitioner] or it could've hurt [the Petitioner]. Who knows . . . what's on the video? In filing a Ferguson motion, I don't know what remedy I would seek.

I don't know what I would ask the Court to do. There's - - is there a negative inference put upon the State? I don't know. Because, again, the video was of the victim in the tobacco store prior to the murder.

Trial counsel testified that he visited the tobacco store, and that video from inside the tobacco store would not have captured what happened at the Chinese restaurant. He said the State acknowledged that the video was not tagged into evidence, and that it did not have the video. He had no idea if the absence of the video was detrimental or beneficial to the Petitioner's case without any knowledge of what it might have shown.

The Petitioner testified that he was aware that there was video evidence in his case that neither he nor trial counsel ever received. He said that his trial counsel did not request a jury instruction on the missing video, made no arguments at trial about the missing video, and did not raise the issue on appeal. The Petitioner also complained about police officers having threatened that he would get a life sentence if he refused to give a statement. He said that both his trial counsel and the trial court were made aware of the officers' coercive tactics, but the jury never heard about it at trial. However, upon questioning by the post-conviction court and later on cross-examination, he acknowledged that he did not give the police any information, and that no statement of his was introduced at trial. He further acknowledged that there were eyewitnesses who identified him as the shooter, that his expert witness was able to contradict a portion of Mr. Green's trial testimony by testifying that Mr. Green informed the expert witness that he never spoke with the Petitioner on the phone, and that a police officer's notes of the tobacco store interior video reflected only that it showed the victim inside the tobacco store. When asked what on the video would have shown his innocence, the Petitioner replied that he did not know.

On July 21, 2023, the post-conviction court entered an order denying the petition for post-conviction relief. This appeal followed.

## ANALYSIS

### I. Denial of Motion to Recuse

The Petitioner first contends that the post-conviction court erred by denying his motion to recuse. In support, he cites the fact that the post-conviction court never addressed or denied post-conviction's counsel's allegation that the post-conviction court threatened to hold post-conviction counsel in contempt for having an associate attorney appear on his behalf on a report date, failed to address "the very significant" issue that post-conviction counsel raised in the Carlos Key case involving post-conviction counsel's allegation that the post-conviction court improperly dismissed Mr. Key's post-conviction petition without

a hearing, and the discrepancy between the date the hearing on the motion to recuse was held and the date that the extensive written order denying the motion was entered. With respect to the latter, he argues that the fact that the written order was apparently "created two days before the [h]earing ever occurred," either made the post-conviction court's findings and conclusions biased and improper or gave rise to an appearance that the findings and conclusions were biased and improper. The State responds that there was no reasonable basis for questioning the post-conviction court's impartiality, and that the post-conviction court sufficiently addressed the grounds for recusal in its order. We agree with the State.

Tennessee Supreme Court Rule 10B provides, in pertinent part, as follows:

1.01. Any party seeking disqualification, recusal, or a determination of constitutional or statutory incompetence of a judge of a court of record, or a judge acting as a court of record, shall do so by a written motion filed promptly after a party learns or reasonably should have learned of the facts establishing the basis for recusal. The motion shall be filed no later than ten days before trial, absent a showing of good cause which must be supported by an affidavit. The motion shall be supported by an affidavit under oath or a declaration under penalty of perjury on personal knowledge and by other appropriate materials. The motion shall state, with specificity, all factual and legal grounds supporting disqualification of the judge and shall affirmatively state that it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. A party who is represented by counsel is not permitted to file a pro se motion under this rule. Any subsequent motion under this section filed in the same case must state, with specificity, substantially different factual and legal grounds than those relied upon in support of a prior motion filed under this section. If a party fails to satisfy this requirement, the subsequent motion may be deemed repetitive and summarily denied as provided in section 1.03.

1.02. While the motion is pending, the judge whose disqualification is sought shall make no further orders and take no further action on the case, except for good cause stated in the order in which such action is taken.

1.03. Upon the filing of a motion pursuant to section 1.01, the judge shall act promptly by written order and either grant or deny the motion. If the motion is denied, the judge shall state in writing the grounds upon which he or she denies the motion.

"A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." Tenn. Sup. Ct. R.10, RJC 2.11 (A). "Bases for which a judge's impartiality might reasonably be questioned include . . . when the judge has a personal bias or prejudice against any of the parties[.]" *State v. Clark*, 610 S.W.3d 739, 744 (Tenn. 2020) (internal quotations and citation omitted). "[T]he test for recusal requires a judge to disqualify himself or herself in any proceeding in which a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." *Id*. (internal quotations and citation omitted). Whether the judge erred by denying the motion to recuse himself or herself is a question of law, which we review de novo. *Cook v. State*, 606 S.W.3d 247, 253 (Tenn. 2020) (citation omitted).

We agree with the State that none of the Petitioner's allegations would give an ordinary person a reason for questioning the post-conviction court's impartiality. Contrary to the Petitioner's assertions, the post-conviction court addressed the Petitioner's allegation regarding the post-conviction court's alleged threat to hold him in contempt by "categorically den[ying] the assertions" made in the motion.

As for the Petitioner's allegation that the post-conviction court demonstrated bias against post-conviction counsel by its dismissal without a hearing of his client, Carlos Key's, post-conviction petition, we note that we recently affirmed the post-conviction court's summary dismissal in that case. *See Key v. State*, No. W2023-01037-CCA-R3-PC, 2024 WL 2783711, at *1 (Tenn. Crim. App. May 30, 2024), *no perm. app. yet filed*.

There is no explanation in the record for the discrepancy in the entry of the file stamped June 20, 2023 order denying the motion and the June 22, 2023 hearing on the motion. We have no way of knowing whether this is a problem with the court clerk's office, or whether the post-conviction court had already drafted and filed the June 20, 2023 order before it held the brief hearing on the matter. Regardless, the discrepancy in the dates, and whether the post-conviction court had already entered an order denying the motion prior to the hearing, does not demonstrate that the post-conviction court harbored bias against post-conviction counsel. As the State points out, the Petitioner presented no evidence at the hearing regarding the motion to recuse, and Tennessee Supreme Court Rule 10B contains no requirement that a trial court hold a hearing prior to ruling on a recusal motion. The fact that the post-conviction court has ruled against post-conviction counsel's clients in the past and perhaps expressed irritation at post-conviction counsel's tactics is insufficient to show that the post-conviction court was biased against post-conviction counsel. We, therefore, conclude that the post-conviction court did not abuse its discretion in denying the motion to recuse.

## II. Denial of Petition for Post-Conviction Relief

The Petitioner next contends that the post-conviction court erred by denying his petition for post-conviction relief, arguing that trial counsel, who admitted at the evidentiary hearing that the missing video may have been helpful, was ineffective for not filing with the trial court a motion to dismiss or a request for a jury instruction on missing evidence and not raising the issue on appeal. The State responds that the post-conviction court correctly denied post-conviction relief, as the trial counsel made a reasonable tactical decision not to move to dismiss or to request a jury instruction, and the Petitioner cannot show any prejudice caused by the video's absence. We agree with the State.

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *Wiley v. State*, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citations omitted). However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) and *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013)). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *Phillips*, 647 S.W.3d at 400 (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

When the State has lost potentially exculpatory evidence, Tennessee courts first analyze whether the State had a duty to preserve the evidence. *State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999). If the proof demonstrates that the State has breached a duty to preserve evidence, a court must evaluate (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. *Id*. The central objective is to protect the defendant's right to a fundamentally fair trial. *Id*. If, after evaluating all the factors, the trial court determines that a trial without the missing evidence would be fundamentally unfair, the trial court may dismiss the charges, deliver a curative instruction to the jury, or craft such other orders as appropriate to protect the defendant's right to a fair trial. *Id*.

- 11 -

In denying the petition for post-conviction relief, the post-conviction court found that "[t]rial counsel made a well-founded strategic choice not to file frivolous motions in this case." The record fully supports the findings and conclusions of the post-conviction court. Trial counsel testified that he could only speculate as to what was on the missing video, and that it could just as easily have hurt, rather than helped, the Petitioner's case. He also testified that he knew from his visit to the tobacco store that surveillance video from the store's interior would not have captured the shooting at the Chinese restaurant. The Petitioner has not met his burden of demonstrating either a deficiency in trial counsel's performance or resulting prejudice to his case. Accordingly, we affirm the post-conviction court's denial of the petition for post-conviction relief.

## CONCLUSION

Based on our review, we affirm the judgment of the post-conviction court.

_____
JOHN W. CAMPBELL, SR., JUDGE